NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 43

No. 2020-166

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Rutland Unit, |
| | Criminal Division |
| | |
| Joseph Leland Bruyette | December Term, 2020 |

David R. Fenster, J.

Thomas J. Donovan, Jr., Attorney General, Montpelier, and Robert C. Menzel, Jr., Assistant Attorney General, Waterbury, for Plaintiff-Appellee.

Matthew F. Valerio, Defender General, and Annie Manhardt, Prisoners' Rights Office, Montpelier, for Defendant-Appellant.

PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.

¶ 1.  **REIBER, C.J.**  Defendant Joseph Bruyette appeals the criminal division's order compelling him to provide a DNA sample for inclusion in the Vermont DNA database. He argues that 20 V.S.A. § 1933(b) excuses him from providing a DNA sample because he has previously provided a sample, and that this issue is properly considered at a sampling-compulsion hearing. We affirm.

¶ 2.  Defendant was convicted of one count of burglary and three counts of sexual assault in 1990. He has been continuously incarcerated in the custody of the Department of Corrections (DOC) since 1987. For most of this time, defendant has been held in facilities out of state.

¶ 3.     In 1998, the Vermont Legislature passed a law creating a state DNA database. 1997, No. 160 (Adj. Sess.).  The statute requires certain persons to submit a DNA sample for inclusion in the database, including "a person who was convicted in a court in this State of a designated crime prior to April 29, 1998 and, after such date, is . . . in the custody of the Commissioner of Corrections [serving a term of imprisonment]."  20 V.S.A. § 1933(a)(2)(A).  The statutory definition of "designated crime" includes any felony and "any crime for which a person is required to register as a sex offender" under Vermont law.  Id. § 1932(12)(A), (C).  Defendant's convictions qualify as designated crimes, so the statute requires him to submit a DNA sample.  See id. § 1933(a)(2)(A).

¶ 4.     DOC has no record of defendant ever providing a DNA sample for the Vermont DNA database.  DOC records reflect that defendant consistently refused to provide a sample each year from 2005 through 2017.  Most recently, defendant refused DOC's request that he provide a DNA sample in 2019.  This time, DOC asked him to sign a refusal form, and defendant refused to sign the form.

¶ 5.     Consequently, the State filed a motion in the criminal division to compel defendant to provide a DNA sample.  See id. § 1935(a) (requiring DOC to file motion to compel when person obligated to provide DNA sample refuses to provide one).  Defendant opposed the motion based on his belief that he had already provided three DNA samples while in DOC custody and contended that the statute relieves him from having to submit another sample.  See id. § 1933(b) ("A person required to submit a DNA sample who is serving a sentence in a correctional facility shall have his or her DNA samples collected or taken . . . if the person has not previously submitted a DNA sample.").  He sought a hearing to present evidence of his prior DNA submissions.  See id. § 1935(b) (entitling person who refuses to provide DNA sample to hearing).

¶ 6.     The criminal division held a hearing to determine whether defendant was required to submit a DNA sample.  The State first called Rebekah Wilkins, a forensic chemist with the

2

Vermont Forensic Laboratory who administers Vermont's DNA database for the Vermont Department of Public Safety (DPS). She explained that Vermont's database is a state-level database, meaning that it hosts DNA samples collected by the State and searches them against state-level unsolved crimes to match or exclude the profile. She testified that she also uploads some Vermont DNA samples to the federal-level database, where samples are searched against unsolved crimes across the country. However, she could not see what other states have uploaded to the federal level or search another state's system. She explained that each state collects DNA and operates its own DNA database separately, following its own state law. She testified that DPS does not consider DNA collected by another state as satisfying the Vermont collection requirement and that DPS has "never accepted a DNA sample collected using another state's collection processing kit." To collect a DNA sample from a Vermont inmate who is incarcerated in an out-of-state facility, DPS provides a Vermont sample-collection card for the sample to be collected and returned, and then uploaded to the Vermont database.

¶ 7. The State next called Cheryl Elovirta, a DOC employee who works as a liaison to DPS to ensure proper collection of DNA samples. She explained that when DOC collects DNA samples, it uses the sample-collection cards provided by DPS. She testified that DOC does not consider another state's collection of DNA for its own database as compliant with Vermont's DNA-collection statute because the statute requires DOC to provide the DNA, and the DPS card ensures that the sample is collected correctly. She confirmed that DOC cannot access another state's DNA database—and in fact, cannot access the Vermont DNA database.

¶ 8. Defendant testified that while incarcerated in DOC custody, he provided DNA samples on three occasions. He recalled that he first provided a DNA sample in Minnesota in 1998 and said that his caseworker told him that Vermont had just created a DNA database and requested his DNA. Next, he recalled providing a DNA sample in Florida when he was transferred to a facility there. Finally, he recalled providing a DNA sample in Kentucky in 2004, and that a

3

caseworker told him that Vermont officials were collecting the sample. Defendant testified that about a week after providing the Kentucky sample, he heard a rumor that Vermont officials had made an error in collection that spoiled the samples and planned to recollect samples the following week, but no one came back. Then, he recalled that a caseworker asked to collect a DNA sample in Kentucky in 2005, and defendant refused because he had previously provided three samples. Subsequently, he said that he had been asked to provide a DNA sample "just about every single year" and continually refused.

¶ 9. Defendant submitted an exhibit from the Florida Department of Law Enforcement documenting its request for defendant's DNA. He contended that, under Florida law, DOC and DPS would be entitled to receive Florida's sample of his DNA, but neither department ever requested it. He then offered to provide another DNA sample if DOC first sought to receive defendant's sample from Florida. At the close of the hearing, the court gave the parties an opportunity to negotiate a resolution and gave the State an opportunity to investigate the samples that defendant allegedly provided. Additionally, the court requested supplemental briefing on the proper interpretation of 20 V.S.A. § 1933(b).

¶ 10. After the hearing, the State submitted a memorandum with affidavits from witnesses Wilkins and Elovirta regarding their investigations into defendant's previously submitted DNA samples. Wilkins averred that she contacted the administrator of Florida's DNA database, who confirmed that the Florida database has defendant's DNA and that the sample was collected in accordance with Florida law, but said that she could not share it with Vermont because Florida does not share database samples. Next, Elovirta explained that she reviewed defendant's case file and the affidavit of the caseworker who attempted to collect defendant's DNA in Kentucky in 2005. She stated that the caseworker's affidavit mentioned an alleged collection in Minnesota, but she determined that the Minnesota Department of Corrections had no record of a sample being taken from defendant. The caseworker's affidavit did not mention a prior collection

4

in Kentucky, and there was no record of any DNA collection in Kentucky that was spoiled or lost. Accordingly, the State argued that defendant had failed to provide a DNA sample to the Vermont database, even if he had provided samples to other states, and that the court should defer to DOC and DPS's interpretation that a sample submitted to another state cannot be accepted into the Vermont database and thus does not satisfy Vermont's statutory requirements.

¶ 11.    Defendant likewise submitted a memorandum that included documentation from the Minnesota Department of Corrections demonstrating that he provided a DNA sample, pursuant to Minnesota law, in 1994.  Based on this DNA sample and the sample provided to Florida in 2001, both taken while he was in DOC custody, he argued that under the plain language of § 1933(b), he was not required to provide another DNA sample because he had previously submitted a sample.

¶ 12.    The criminal division granted the State's motion to compel defendant to submit a DNA sample.  The court found that defendant provided a DNA sample to the State of Florida in 2001 but found that the sample was not taken for submission to the Vermont DNA database.  The court also found that defendant provided a DNA sample to Minnesota in 1998 and another sample to Kentucky in 2004.  While defendant testified that these samples were for the Vermont DNA database, the court explained that there was inconclusive evidence to find that either sample was taken for submission to the Vermont database.

¶ 13.    The court concluded that under 20 V.S.A. § 1935, the Legislature limited the scope of the issues at a DNA sampling-compulsion hearing to whether the person was convicted of a designated crime, pursuant to § 1933(a), or whether the DNA-database statutes were unconstitutional.  See State v. Ritter, 2008 VT 72, ¶ 6, 184 Vt. 565, 956 A.2d 1141 (mem.) ("The only challenges defendant might have raised at the sampling-compulsion hearing were that he had not been convicted of a designated crime . . . or that the DNA-database statutes are constitutionally infirm.").  The court concluded that defendant had been convicted of a designated crime and remained in DOC custody, so defendant was required to submit a DNA sample under § 1933(a)(2).

5

Because defendant was required to submit a sample and had refused to provide one, the court determined that the State was entitled to an order compelling defendant to provide a DNA sample under § 1935(c).

¶ 14. The court next addressed defendant's argument that, under § 1933(b), he need not provide a DNA sample because he had previously submitted a sample. The court explained that defendant was a person required to submit a DNA sample under the plain language of § 1933(a), and § 1933(b) did not change that result. Instead, § 1933(b) merely explains how a sample will be collected when a person is in a correctional facility. The court further explained that the DNA statute draws a distinction between the collection of a sample and the submission of a sample, and the disputed language in § 1933(b) requires that "the person has not previously submitted a DNA sample." 20 V.S.A. § 1933(b) (emphasis added). Thus, the court concluded that to comply with the statute, defendant's DNA sample needed to be submitted to the Vermont database, and while defendant's DNA sample may have been collected previously, it had not been submitted to the Vermont DNA database as required.

¶ 15. The court reasoned that its conclusion was consistent with the purpose of the statute. Section 1931 adopts a state policy of assisting criminal justice and law enforcement agencies to solve crimes by matching or excluding DNA in the state database against DNA linked to an unsolved crime, and to help identify missing persons. Id. § 1931. If defects in the collection process that prevented the DNA sample from being submitted to the Vermont DNA database relieved a person from inclusion in the database, this outcome would frustrate the purpose of the statute. Further, the court reasoned that if the Legislature had intended § 1933(b) to exempt a person from inclusion in the database after one defective collection, it would have made that an issue for the compulsion hearing. Lastly, the court noted that its interpretation was consistent with DOC's interpretation, which is entitled to deference, and defendant failed to show why DOC's

6

interpretation was arbitrary or capricious. The court ordered defendant to provide a DNA sample to DOC. Defendant has since provided a sample.

¶ 16. Defendant appealed, arguing that under the plain language of 20 V.S.A. § 1933(b), a person who has already submitted a DNA sample while in DOC custody is not required to submit another, regardless of whether the sample is in the Vermont DNA database. He also argues that this issue is properly considered at a sampling-compulsion hearing under § 1935. Although he has already provided a DNA sample, he asks this Court to order that his information be expunged from the Vermont DNA database under § 1935(e).

¶ 17. Statutory interpretation is a question of law which we review de novo. State v. Eldredge, 2006 VT 80, ¶ 7, 180 Vt. 278, 910 A.2d 816. Our goal is to give effect to the Legislature's intent, "so we first look at the plain, ordinary meaning of the statute." Id. If the language is clear, we apply the statute according to its plain meaning. Id.

### I. 20 V.S.A. § 1933

¶ 18. We first address defendant's argument that § 1933(b) relieves incarcerated people in DOC custody from being required to submit more than one DNA sample. The statute provides, in relevant part:

> A person required to submit a DNA sample who is serving a sentence in a correctional facility shall have his or her DNA samples collected or taken at the receiving correctional facility, or at a place and time designated by the Commissioner of Corrections or by a court, if the person has not previously submitted a DNA sample.

20 V.S.A. § 1933(b) (emphasis added). The Legislature added the disputed language to § 1933(b) in a 2009 amendment. See 2009, No. 1, § 21.[1]

---

[1] The 2009 amendment also added the language "if the person has not previously submitted a DNA sample in connection with the designated crime for which he or she is serving the sentence," to § 1933(c), which is not at issue in this appeal.

7

¶ 19. Defendant argues that the plain language of § 1933(b) is clear: an incarcerated person is only required to submit a DNA sample if he or she has not previously submitted one. DOC urges us to adopt the reasoning of the criminal division and conclude that the DNA subchapter distinguishes between "collection" and "submission," and the term "submit" requires that the sample be submitted to the Vermont DNA database. DOC contends that it has interpreted the statute to require submission to the Vermont DNA database and argues that we should defer to the department's interpretation. See In re Porter, 2012 VT 97, ¶ 8, 192 Vt. 601, 70 A.3d 915 ("We defer to an administrative agency's interpretation of statutory provisions that are within its particular area of expertise." (quotation omitted)).

¶ 20. Under defendant's interpretation, DNA provided to another jurisdiction, for any reason, would exempt a person from the statutory requirement to provide a DNA sample to the Vermont database. Likewise, if an issue occurred in the collection or submission of a DNA sample that prevented the State from inputting the sample into the Vermont DNA database, even at no fault of the State's, the person would be exempted from inclusion. This interpretation conflicts with the explicit purpose of the statute. If any submission to another jurisdiction or any defect in the collection or submission process, regardless of the cause, relieved a person from the obligation to provide a DNA sample to the Vermont database, the statute would inhibit the effective use of the DNA database. See 20 V.S.A. § 1931 (stating that policy of DNA statute is to assist "law enforcement agencies in the identification, detection, or exclusion of individuals who are subjects of the investigation or prosecution of crimes" and to "identify missing persons"). We will not interpret the statute in a manner that counters the purpose of the statute and renders it ineffective. See Town of Killington v. State, 172 Vt. 182, 189, 776 A.2d 395, 401 (2001) ("[W]e will not enforce the common and ordinary meaning of statutory language if doing so would render the statute ineffective or lead to irrational results.").

¶ 21. But on the other hand, the statutory language belies DOC's argument that the Legislature used the terms "collect" and "submit" to refer to specific actions and "submit" means submission to the Vermont DNA database. In § 1933, the statute exclusively uses the term "submit" when explaining who is required to provide a DNA sample and where they are required to do so. See 20 V.S.A. § 1933. But in § 1935, which outlines the procedure applicable when a person refuses to provide a DNA sample, the statute exclusively uses the term "provide," even when referring to required persons under § 1933. See id. § 1935. The interchangeable uses of two different terms shows that the statute does not use the term "submit" as a term of art to mean submission to the Vermont DNA database.

¶ 22. Nor would such an interpretation of the term "submit" make sense. Section 1933 requires certain persons to submit a DNA sample, but as defendant notes, once an incarcerated person provides a sample to DOC, the person has no control over how that sample ultimately ends up in the Vermont DNA database. Instead, DOC is responsible for "collect[ing] and submit[ting] DNA samples to the [Vermont Forensic] Laboratory" so that DPS can receive and process the samples into the database. DNA Database Unit Operating Policy and Procedures § III(A)-(B), Code of Vt. Rules 28 060 001 [hereinafter DPS DNA Database Procedures], http://www.lexisnexis.com/hottopics/codeofvtrules. Construing § 1933 to require an incarcerated person to ensure that the person's DNA sample is properly included in the Vermont DNA database would create an absurd result. See State v. Tuma, 2013 VT 70, ¶ 8, 194 Vt. 345, 79 A.3d 883 (explaining that "we do not construe statutes in such a way as to lead to absurd or irrational results" (quotation omitted)).

¶ 23. DOC's interpretation of the statute would further mean that a person could be required to furnish as many samples as needed to ensure that the sample is properly submitted. This Court has held that "[d]efendants, like the rest of us, have an expectation of privacy in their oral cavity and in the information contained in their DNA." State v. Medina, 2014 VT 69, ¶ 13,

9

197 Vt. 63, 102 A.3d 661. We have recognized that "[t]he initial taking of the DNA sample" and the "subsequent analysis, storage, and searching of the DNA profile" are independent intrusions under Article 11 of the Vermont Constitution. State v. Martin, 2008 VT 53, ¶ 14, 184 Vt. 23, 955 A.2d 1144. An interpretation that could compel a person to repeatedly provide DNA samples raises constitutional concerns, and "[w]e generally construe statutes to avoid constitutional difficulties, if possible." State v. Berard, 2019 VT 65, ¶ 16, 211 Vt. 39, 220 A.3d 759 (quotation omitted).

¶ 24. But we need not defer to DOC's interpretation because § 1933 is not ambiguous. See Clayton v. J.C. Penney Corp., 2017 VT 87, ¶ 17, 206 Vt. 28, 177 A.3d 522 (explaining that Court defers to agency interpretation when statutory language is "silent or ambiguous"). The statute provides that a DNA sample from an incarcerated person shall be "collected or taken at the receiving correctional facility, or at a place and time designated by the Commissioner of Corrections or by a court, if the person has not previously submitted a DNA sample." 20 V.S.A. § 1933(b). The plain language clearly contemplates that the DNA sample is to be taken by or at the behest of DOC, and not any other agency or jurisdiction, because of the person's status as an inmate committed to DOC custody. A person who has a DNA sample collected by another agency or jurisdiction is not exempt from this requirement if DOC has not previously collected a sample from that person. Accordingly, we conclude that § 1933(b) entitles DOC to collect the DNA sample of all incarcerated persons required to provide one and to collect one sample as a matter of course. [2]

----

[2] We recognize that there may be some circumstances in which DOC collects a DNA sample and fails to submit the sample to the Vermont DNA database for reasons that are not due to DOC's negligence. Given the clear purpose announced in § 1931, it is unlikely that the Legislature intended to foreclose DOC from seeking another DNA sample after one defective attempt in all circumstances. See Delta Psi Fraternity v. City of Burlington, 2008 VT 129, ¶ 7, 185 Vt. 129, 969 A.2d 54 (explaining that when plain meaning of statute conflicts with other expressions of legislative intent or creates absurd result, "the intent must prevail" (quotation omitted)). Because the number of attempts which the State may make to obtain a subsequent DNA

¶ 25. Further, the plain language of the statute does not distinguish between persons in the custody of DOC who are incarcerated in correctional facilities in Vermont and those who are incarcerated in out-of-state facilities. The statute authorizes DOC to coordinate collection of a DNA sample with an out-of-state receiving facility or to designate a time and place for collection out of state. As such, the statutory limit on the number of samples an incarcerated person must provide to DOC applies regardless of where the person is housed. Cf. Nichols v. Hoffman, 2010 VT 36, ¶ 12, 188 Vt. 1, 998 A.2d 1040 (concluding that persons incarcerated by DOC in out-of-state facilities were entitled to statutory right to access to debit calling cards under Vermont law).

¶ 26. This conclusion is consistent with both the purpose of the statute and the protections provided therein. When DOC collects or requests a DNA sample, DOC is responsible for following the proper procedures so that the sample can be submitted to DPS for inclusion in the Vermont DNA database. See DPS DNA Database Procedures, § III (laying out procedure for receipt and processing of DNA samples). By the same token, DOC assumes the risk of failure to properly collect and submit the sample. This ensures that the Vermont DNA database functions effectively in accordance with the purpose outlined in § 1931, and at the same time, that DOC complies with the statutory protections for incarcerated persons.

¶ 27. Here, however, the record contains insufficient evidence to conclude that defendant's prior DNA samples were collected by or at the behest of DOC. The trial court found that DOC had no record of defendant ever providing a DNA sample for the Vermont DNA database. As to the DNA sample that defendant provided to Florida in 2001, defendant submitted documentation showing that the sample was collected by the Florida Department of Law Enforcement, and DPS confirmed that Florida has defendant's DNA in its state database and collected the sample under Florida law. The record thus supports the trial court's finding that the

sample after a sample has been taken by or at the behest of DOC is not at issue in this appeal, we do not reach the question.

11

Florida sample was not taken for submission to the Vermont DNA database. See State v. Richard, 2016 VT 75, ¶ 8, 202 Vt. 519, 150 A.3d 1093 (providing that Court reviews factual findings for clear error and will uphold findings "if any reasonable and credible evidence in the record supports them").

¶ 28. As to defendant's other DNA samples, he submitted documentation showing that he provided a sample to Minnesota in 1994 under Minnesota law,[3] and testified that he provided a sample to Kentucky in 2004. Although defendant said that he was told that these samples were for the Vermont database, the collection in Minnesota predated the enactment of the Vermont DNA statute in 1998. See 1997, No. 160 (Adj. Sess.), § 7 (creating Vermont DNA database and DNA collection requirements, effective April 29, 1998). And while defendant also said that he heard a rumor that the Kentucky sample was spoiled or lost, the trial court was not required to accept his version of events given the conflicting evidence provided by DOC. See Richard, 2016 VT 75, ¶ 8 (explaining that "trial court is in the unique position to assess the credibility of the witnesses and the weight of all the evidence presented" (quotation omitted)). DOC had no record of a DNA sample provided by defendant in Kentucky in 2004 or of any samples taken then that were spoiled or lost. The trial court also heard testimony that DPS does not accept DNA samples collected by other jurisdictions for submission to the Vermont database and that DOC must provide the sample. This record supports the trial court's determination that the evidence was inadequate to find that these samples were taken for submission to the Vermont DNA database. See id.

¶ 29. Although the trial court made these findings in line with an interpretation of § 1933(b) that we reject—that the statute requires submission to the Vermont DNA database—the same record supports our conclusion. The evidence in the record is likewise inadequate for the

---

[3] Defendant testified, and the trial court found, that defendant provided this DNA sample in 1998. But regardless of the date of the collection in Minnesota, the record lacks any evidence indicating that this sample was collected by or at the request of DOC.

trial court to have found that any of defendant's prior DNA samples were taken or requested by DOC.[4]

¶ 30.    Accordingly, we affirm the trial court's order, but for a different reason than relied on by the court.  See Caledonia-Record Pub. Co. Inc. v. Vt. State Colls., 2003 VT 78, ¶ 7, 175 Vt. 438, 833 A.2d 1273 (explaining that "Court may affirm judgment where right result was reached for wrong reason").  Because defendant is required to provide a DNA sample under § 1933(a) and there is insufficient evidence that his prior DNA samples were collected by or at the behest of DOC under § 1933(b), the court properly granted DOC's motion to compel him to provide a DNA sample.

## II.  Scope of Sampling-Compulsion Hearing

¶ 31.    We next address the proper scope of a DNA sampling-compulsion hearing under § 1935.  The statute, in relevant part, lays out the following procedure for the hearing:

> (a) If a person who is required to provide a DNA sample under this subchapter refuses to provide the sample, the commissioner of the department of corrections or public safety shall file a motion in the superior court for an order requiring the person to provide the sample.
>
> (b) The person who refuses to provide a DNA sample shall be served with a copy of the motion and shall be entitled to a hearing by the court, limited in scope solely to the issues described in subsection (c) of this section.
>
> (c) If the court finds that the person who refused to provide a DNA sample is a person required by section 1933 of this subchapter to provide a DNA sample, the court shall issue a written order requiring the person to provide the DNA sample in accordance with the provisions of this subchapter.

20 V.S.A. § 1935.

---

[4]    We understand appellant to implicitly argue that collection of a DNA sample by authorities of another state where an inmate in the custody of DOC is housed is tantamount to collection by DOC.  Whether the collection is by, for, or at the behest of DOC is fundamentally a factual question.  Whether and under what circumstances authorities in another state are entitled to require an inmate in the custody of DOC to give a DNA sample that has not been requested by DOC is a legal question that is not squarely before us in this case.

¶ 32. The trial court concluded that § 1935 limited the scope of the issues at a sampling-compulsion hearing to whether defendant was convicted of a designated crime under § 1933, pointing to two previous decisions of this Court. In State v. Wigg, the defendant argued at his sampling-compulsion hearing that he was not required to give a DNA sample because he was currently seeking post-conviction relief, so the judgment against him was not final. 2007 VT 48, ¶ 3, 181 Vt. 639, 928 A.2d 494 (mem.). We rejected this argument, explaining that § 1935 "limits the scope of the compelled-sampling hearing to the sole issue of whether the person refusing to provide the sample is a person statutorily required to provide one," and also noted that defendant could challenge the constitutionality of the sampling statute itself. Id. ¶ 5 & n.3. We explained that the sampling-compulsion hearing is "not a forum for defendants to collaterally attack their convictions," and, if the defendant's conviction were later overturned or pardoned, he could seek to have his DNA information removed from the state database under 20 V.S.A. § 1940. Id. ¶ 6. We rephrased this holding in a narrower way in State v. Ritter, saying that "[t]he only challenges defendant might have raised at the sampling-compulsion hearing were that he had not been convicted of a designated crime . . . or that the DNA-database statutes are constitutionally infirm." 2008 VT 72, ¶ 6, 184 Vt. 565, 956 A.2d 1141 (mem.).

¶ 33. Subsequently, in 2009, the Legislature amended § 1933, in part adding the language in § 1933(b) at issue in this case. See 2009, No. 1, § 21. The plain language of § 1935(c) refers to "section 1933" and not to any particular subsection therein. Had the Legislature intended to limit the scope of the hearing to whether a person was convicted of a designated crime, it could have referred specifically to § 1933(a), but it did not. See Trombley v. Bellows Falls Union High Sch. Dist. No. 27, 160 Vt. 101, 104, 624 A.2d 857, 860 (1993) ("[I]n construing a statute, we presume that language is inserted in a statute advisedly."). Accordingly, we conclude that the scope of the sampling-compulsion hearing is broader than the rule announced in Ritter, and

14

necessarily requires a court to consider whether a person is required to provide a DNA sample under any provision in § 1933.

¶ 34. But despite the trial court's erroneous conclusion that the scope of the sampling-compulsion hearing was restricted to determining whether defendant was convicted of a designated crime, it did not limit its analysis accordingly. Instead, the trial court took testimony and accepted post-hearing memoranda about the State's DNA collection procedures and operation of the Vermont DNA database, defendant's alleged prior DNA submissions, and whether § 1933(b) limits the number of DNA samples that an incarcerated person may be required to provide. And after considering that evidence and defendant's argument under § 1933(b), the court rejected defendant's position that the statute exempts him from providing a subsequent sample. Because defendant was able to present his arguments and evidence below, the court's erroneous conclusion about the scope of § 1935 was harmless. See V.R.Cr.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.").

Affirmed.

FOR THE COURT:

 

_____
Chief Justice